CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED
2/17/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| BRANDON HART, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 4:25-cv-00013 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| ANDREW QUIRK, | ) | By:   Hon. Thomas T. Cullen |
| | ) |        United States District Judge |
| Defendant. | ) | |

Plaintiff Brandon Hart ("Hart") sued Andrew Quirk ("Quirk") after Quirk's vehicle struck him while Hart stood near the center dividing line of a two-lane road. Just before the collision, Hart had stopped his tractor-trailer at the entrance to an underpass[1] because he was concerned that his trailer was too tall to proceed. As Hart eyeballed the height of the underpass, Quirk's oncoming car emerged from the narrow tunnel and hit Hart's leg and foot.[2]

Quirk has moved for summary judgment, arguing that Hart's contributory negligence was a proximate cause of the collision and his injuries. Because reasonable minds could not differ on the question of Hart's negligence, Virginia law mandates summary judgment for Quirk.

---

[1] The court will use the terms "underpass" and "tunnel" interchangeably. As depicted in the photographs included below, they both refer to a passageway underneath a railroad embankment.

[2] Hart suffered fractures to his right foot, which he claims caused him to miss work, and eventually resulted in the loss of his job. (Compl. ¶ 8.) He still suffers from intermittent leg pain that is exacerbated by inclement weather. (*Id.*)

## I.    BACKGROUND

The following facts are either undisputed or presented in the light most favorable to Hart, the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Henry v. Purnell*, 652 F.3d 524, 527 (4th Cir. 2011). They are primarily established through the deposition testimony of Hart and Quirk (*see generally* Hart Dep. [ECF No. 15-1]; Quirk Dep.[3]); the affidavit of Chris Bell, the police officer who responded to the accident scene (*see* Aff. of C. Bell [ECF No. 15-2]); and various photographs (*see* Def.'s Br. Supp. Mot. Summ. J. at 5–9 ("Def.'s Br.") [ECF No. 15]).

For the most part, the facts are undisputed. Hart was employed as a driver for Lincoln Bowen, LLC, a trucking company based in Aiken, South Carolina. (Hart Dep. 7:22, 24:11–13.) The accident occurred on March 10, 2022, along Bridge Street, a two-lane road in Martinsville, Virginia, at approximately 11:20 a.m. (Def.'s Br. at 1.) It was not raining that morning, and the weather was otherwise unremarkable. (Hart Dep. 60:22–61:4.) When Martinsville Police Officer Chris Bell arrived, he observed Hart's tractor-trailer stopped "in the northbound travel lane of Bridge Street, at or just prior to the entrance to the tunnel." (Aff. of C. Bell ¶ 6.) According to Officer Bell, the following photographs are fair and accurate depictions of Bridge Street where the accident occurred:

---

[3] Although the parties did not cite or rely on Quirk's deposition testimony in their respective briefs, the court requested a copy of Quirk's deposition, and the parties helpfully provided a copy. It will be made a part of the record of this case.





(*Id.* ¶¶ 4, 5.)

Hart's recollection of certain details preceding the accident is hazy. For instance, he does not recall how he traveled to Martinsville that day—whether from somewhere inside Virginia or from out-of-state—but he admits that he had never been to Martinsville before. (Hart Dep. 34:16–23, 35:21–37:22.) He recalls, however, that he was carrying an empty, 53-

foot box trailer and that he was scheduled to pick up a load from a nearby business. (*Id.* 32:4–12, 35:5–6.) As was his typical practice, Hart utilized GPS on his cell phone to navigate to his destination, but he does not recall which navigation software or application he used for these directions. (*Id.* 58:3–12.) He also does not remember if he measured the height of his trailer before embarking on this trip, which would have been consistent with his commercial driver's license ("CDL") training. (*Id.* 31:23–32:3, 33:11–22.)

Although Hart has no recollection of how he ended up in Martinsville—let alone on Bridge Street—his memory of the events immediately prior to the accident is better. (*Id.* 37:6–8.) As Hart approached the Bridge Street tunnel, he grew concerned that his trailer might be too tall to pass through it. According to Hart: "As I approached the bridge, I didn't want to tear the bridge up in Martinsville[,] and I didn't want to tear up my boss' equipment. So I had to use better judgment and get out of the vehicle and check my clearance that way." (*Id.* 38:12–18.) Erring on the side of caution (or so he apparently thought), Hart stopped his rig in his lane of travel near the entrance to the tunnel and activated his emergency flashers. (*Id.* 43:2–18.) He then climbed out of the cab and walked towards the trailer until he reached a vantage point where he could "look at the height of the truck and the height of the bridge" to determine whether it was safe to proceed. (*Id.* 43:21–44:5.) Hart insists that, as he did so, he was careful to stay on his side of the yellow lane line. (*Id.* 42:17–18; 50:12–14.) According to Hart, once he had walked far enough towards the rear of the trailer, he stopped to assess the situation. (*Id.* 43:21–44:5.) When he did, Quirk's vehicle suddenly emerged from the tunnel at

"high rate of speed," crossed the yellow line, and struck Hart's right foot and lower leg.[4] (*Id.* 44:4–5.)

For his part, Quirk testified that, just as he emerged from the Bridge Street tunnel, "a gentleman stepped into the road into my lane." (Quirk Dep. 36:12–13.) Quirk explained:

> And he was right next to the tunnel. So he had—my memory is that the nose of his vehicle—he put the nose of his vehicle into the tunnel. . . . And then he stepped out of his vehicle, which is stepping high down low and I think he got a bit of momentum and stepped into my lane. And I did not—there was no way from that tunnel, it's tight. There's no way to see him. If he steps out from the concrete divider that separates the two lanes, **I couldn't see him until the last absolute second**.

(*Id.* 41:7–20 (emphasis added).) Quirk added that he tried to avoid hitting Hart by swerving to the right, but this evasive action was futile. (*Id.* 42:10, 58:11–16.) Despite opposing counsel's persistence—and occasional badgering—Quirk was adamant that he had not seen Hart, or his truck, until he emerged from the narrow tunnel a split second before the collision:

> So it's a very tight tunnel. The tunnel is dead straight, so you can see all the way through when you enter it, but you can't see anything to the sides. There are support dividers all the way down the middle. So you can't really see the other lane…. So I could only see Mr. Hart's truck—the exact location of Mr. Hart's truck until after the accident.

(*Id.* 55:3–8, 12–14.) Quirk added that, because of the tunnel's straight path and the presence of the concrete lane dividers, his field of view was like "looking down the barrel of a gun." (*Id.*

---

[4] Hart later conceded that he doesn't have any personal knowledge as to how fast Quirk was traveling when he emerged from the tunnel and struck him. He claims that he overheard unidentified people on the scene remark that Quirk may have been traveling 40–45 mph. (Hart Dep. 47:5–20.) These statements, insofar as they were ever made, constitute hearsay and are not considered. Quirk himself testified that he was traveling no faster than 25 mph when he emerged from the tunnel. (Quirk Dep. 58:6.) There is no other evidence in the record as to how fast Quirk was driving when he emerged from the tunnel or what the posted speed limit was.

73:11.) He saw Hart for the first time only when he emerged from the tunnel, and, by then, it was too late to avoid him.

Following the collision, Hart was able to climb back into his truck with assistance and back it into a nearby parking lot "a little ways back off the side of the road." (Hart Dep. 69:12–70:1.) From there, he was transported by ambulance to a local hospital where he was assessed and released the same day. (*Id.* 70:4–15.) After being released, Hart returned to his rig and then drove it back to South Carolina. (*Id.* 71:4–72:20.)

During his deposition, Hart, who possessed a valid CDL, acknowledged that, as part of his initial CDL training, he had been instructed on the importance of knowing the height and width of the tractor and trailer he was operating, as well as checking "for clearance signs" when approaching bridges and tunnels. (*Id.* 28:6–29:19, 31:23–32:3.) In response to a series of questions from defense counsel, Hart also correctly described and identified various types of traffic signage, including signs indicating height restrictions for bridges and tunnels, as well as signs prohibiting trucks, regardless of their size, from traveling down certain streets. (*See generally id.* 51:7–53:7.) Hart vehemently maintains that he is "always looking for signs," but that he "just didn't see any signs that day." (*Id.* 38:12–13.)

Unfortunately for Hart (and his lawsuit), there were several pertinent traffic signs posted on the roadway prior to reaching the Bridge Street tunnel. As noted above, Hart doesn't recall how he ended up on Bridge Street to begin with. (*Id.* 36:16–38:1.) But it is undisputed, based on his northerly direction of travel, that he had turned either left or right onto this road from South Memorial Boulevard, a major four-lane thoroughfare in Martinsville. (Aff. of C. Bell ¶ 7.) According to Officer Bell's affidavit, which Hart does not dispute, if Hart turned

- 6 -

right from South Memorial Boulevard, he would have encountered two traffic signs indicating that trucks were prohibited on Bridge Street:





(*Id.* ¶¶ 8, 10.) Or if he approached the Bridge Street turn from the opposite direction, he would have encountered the following traffic sign indicating the same restriction:





(*Id.* ¶¶ 9, 11.) What's more, once Hart made the illegal turn onto Bridge Street, he would have passed another sign indicating that trucks were prohibited and, a short distance past that marker, a sign indicating the height of the upcoming tunnel:







(*Id.* ¶ 14–16.) Moreover, as these photographs establish, Hart passed a large empty parking lot on his right, just past this height-restriction sign, a short distance from the entrance to the tunnel:



(*Id.* ¶ 4.) According to Officer Bell, the parking lot depicted in this last photograph is the same parking lot into which Hart backed his truck after the accident. (*Id.* ¶ 18.)

Hart initially filed this negligence action in Henry County Circuit Court. (Def.'s Br. at 1–2.) After taking discovery, Hart nonsuited that action and refiled his suit in federal court. (*Id.*) By this court's prior order, the parties incorporated the discovery taken while the case was pending in state court into the present action. (Def.'s Br. at 2.) Quirk subsequently filed the instant motion for summary judgment. (Mot. Summ. J. [ECF No. 14.) The parties fully briefed the motion and provided the court with the record evidence previously developed in discovery, including the parties' deposition transcripts, the police officer's affidavit, and the photograph exhibits discussed above. The court has carefully reviewed these materials and the written arguments of counsel. As explained below, this record evidence, when viewed in the light most favorable to Hart, leads to the ineluctable conclusion that his contributory negligence was a proximate cause of the accident and his alleged injuries.[5]

## II.   SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (quoting former Fed. R. Civ. P. 56(c)). Whether a fact is material depends on the relevant substantive law. *Anderson*, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual

---

[5] The court will also dispense with oral argument because it would not aid the decisional process.

disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party carries its burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (cleaned up) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson*, 477 U.S. at 255. But the nonmoving party must "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no

genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

Even though summary judgment may be an appropriate tool to eliminate trial in some cases, it "must be used carefully so as not . . . to foreclose trial on genuinely disputed, material facts." *Thompson Everett, Inc. v. Nat'l Cable Advert., LP*, 57 F.3d 1317, 1323 (4th Cir. 1995). "The question at the summary judgment stage is not whether a jury is *sure* to find a verdict for the plaintiff; the question is whether a reasonable jury could rationally so find." *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 334 (4th Cir. 2011) (emphasis in original).

### III.  DISCUSSION

Virginia law controls this diversity action. *See Erie R.R. v. Tompkins*, 304 U.S. 64, 78–79 (1938). In Virginia, "[n]egligence of the parties may not be compared, and any negligence of a plaintiff which is a proximate cause of the accident will bar recovery." *Litchford v. Hancock*, 352 S.E.2d 335, 337 (Va. 1987). Put simply, contributory negligence on the part of a plaintiff is a complete bar to his recovery. *Id.*; *see also Fein v. Wade*, 61 S.E.2d 29, 32 (Va. 1950). Ordinarily, questions of negligence—including contributory negligence and attendant proximate cause—are questions for the jury. *Artrip v. E.E. Berry Equipment Co.*, 398 S.E.2d 821, 823 (Va. 1990). But these issues become questions of law "when reasonable minds could not differ about the conclusion to be drawn from the evidence." *Litchford*, 352 S.E.2d at 337.

In support of his motion for summary judgment, Quirk first argues that Hart was contributorily negligent under the doctrine of negligence *per se*. A plaintiff is negligent *per se* if, prior to the accident giving rise to his lawsuit, he violated a traffic statute. *Bentley v. Felts*, 445 S.E.2d 131, 133 (Va. 1994) ("Violation of a traffic statute constitutes negligence . . . ."); *see also*

- 13 -

*Hot Shot Express, Inc. v. Brooks*, 563 S.E.2d 764, 768 (Va. 2002). But that does not end the inquiry. A defendant who relies on a plaintiff's contributory negligence to bar his claim must also prove that his "negligence was a proximate cause, a direct, efficient contributing cause of the accident." *Whitfield v. Dunn*, 117 S.E.2d 710, 714 (Va. 1961); *see also Bentley*, 445 S.E.2d at 133. That is, although a violation of a traffic statute constitutes negligence, "it does not necessarily follow that such negligence will as a matter of law prevent a recovery by the plaintiff." *Powell v. Virginian Ry. Co.*, 46 S.E.2d 429, 432 (Va. 1948). "[U]nless it is shown that the plaintiff's violation was a proximate or concurring cause which contributed directly to his injury, he is not thereby barred from a recovery." *Id.* And where a defendant claims that a plaintiff's contributory negligence was a proximate cause of the accident at the summary judgment stage, he must establish that the record is devoid of disputed material facts that would allow a reasonable jury to reach a different conclusion.

Quirk clears this high bar. Even assuming, in the light most favorable to Hart, that Quirk traveled through the tunnel at a high rate of speed[6] or that he crossed the yellow dividing line, Hart's negligence *per se* was unquestionably a proximate cause of the collision and his injuries. In short, Hart was negligent *per se* because he turned his tractor trailer from South Memorial Boulevard onto Bridge Street in direct contravention of clear traffic signs indicating that trucks were prohibited on this road. (*See* Aff. of C. Bell ¶¶ 4–16.) He was also negligent in continuing down Bridge Street despite additional signage indicating the same, until he reached the tunnel's entrance. In failing to obey these traffic signs, Hart violated Virginia Code § 46.2-830, which provides that "[a]ll drivers of vehicles shall obey lawfully erected traffic

---

[6] Again, there is no admissible evidence that Quirk was, in fact, speeding.

control devices."[7] Logic and common-sense dictate that the primary purpose of this statute, and the signs at issue, is to protect individuals, including Hart himself, from the hazards attendant to driving oversized vehicles toward tunnels not tall enough to facilitate their safe passage. These hazards necessarily include the exact scenario that manifested here—*i.e.*, a driver exiting his truck at the entrance of a narrow tunnel, standing near the middle of the road, and subjecting himself to the serious risk of being hit by oncoming traffic emerging from that tunnel. In other words, Hart's breach of this traffic statute gave rise to the very condition it was designed to prevent. Any reasonable observer must conclude that Hart was negligent *per se*, and that his negligence was "a proximate, direct, and efficiently contributing cause" of the collision and his injuries. *Whitfield*, 117 S.E.2d at 714.

Quirk, moreover, is entitled to summary judgment based on Hart's contributory negligence under ordinary negligence principles. Every driver in Virginia "has a duty to use ordinary care to maintain a proper lookout, and to keep his vehicle under proper control[.]" *Litchford*, 352 S.E.2d at 336 (citations omitted). A driver who fails to see visible traffic signs breaches his duty to maintain a proper lookout, while a driver who sees, but fails to obey, visible traffic signs breaches his duty to properly control his vehicle. *Mitchell v. Lee*, 194 S.E.2d 737, 739 (Va. 1973). "In the discharge of the[se] duties, a driver is required to use ordinary care to observe other vehicles on the highway, to see what a reasonable person would have seen, and to react as a reasonable person would have reacted under the circumstances to avoid a collision." *Litchford*, 352 S.E.2d at 337.

---

[7] "'Traffic control device' means a sign, signal, marking, or other device used to regulate, warn, or guide traffic placed on, over, or adjacent to a street, highway, private road open to public travel, pedestrian facility, or shared-use path by authority of a public agency or official having jurisdiction . . . ." Va. Code Ann. § 46.2-100.

Hart was ordinarily negligent under this well-established standard. The court accepts as true Hart's testimony that, despite the presence of numerous signs, he "just didn't see any signs that day." (Hart Dep. 38:13.) But this assertion does nothing to save his claim. In *Mitchell*, a lead Virginia Supreme Court decision establishing a driver's duty to maintain proper lookout, the plaintiff argued that she had not seen a "Men Working" sign and thus had not received ample warning of road construction before plowing into a large highway grader traveling ahead of her at a low rate of speed. 194 S.E.2d at 631. The court rejected this claim, concluding:

> Here[,] the evidence shows that the accident occurred in broad daylight. The "Men Working—25 M.P.H." sign was located approximately 1500 feet east of the point where plaintiff's car crashed into the motor grader, and was clearly visible to drivers of motor vehicles traveling west before and after the collision. She thus received ample warning that construction work was in progress on the highway and that her speed should be reduced to 25 miles per hour. Plaintiff's statement that she did not see the sign is merely negative testimony and is indicative of the fact that she was not keeping a proper lookout.

*Id.* at 739. Insofar as Hart apparently failed to see *at least* two signs prohibiting trucks from traveling on Bridge Street, he was even more negligent than the plaintiff in *Mitchell*. And Hart's contributory negligence was undoubtedly a proximate cause of the collision and his injuries. But for Hart's negligence in failing to see the signs, he never would have turned on, let alone stood near the middle of, Bridge Street at the entrance to a narrow tunnel, thus putting himself in a position to be struck by Quirk's oncoming vehicle. *See Huffman v. Sorenson*, 76 S.E.2d 183, 187 (Va. 1953) ("The proximate cause of an event is that cause which, in natural and continuance sequence, unbroken by any efficient intervening cause, produces that event, and without which that event would not have occurred.").

Hart raises three principal arguments in an attempt to overcome summary judgment. First, Hart contends that Quirk, in using the term "proximate cause" in his brief only three times, failed to adequately develop this discrete—and ultimately dispositive—element of contributory negligence. (*See* Pl.'s Br. Opp. Mot. Summ. J. ("Pl.'s Br.") at 1 [ECF No. 19].) Hart argues that by glossing over the issue of proximate cause, Quirk forfeited his right to summary judgment. (*Id.*) Second, and relatedly, he argues that Quirk failed to cite the "controlling law of Virginia" on the issue of negligence, including that questions of proximate cause are typically reserved for a jury, unless reasonable minds could not disagree on that issue. (*Id.* at 2–4.)

Insofar as the cases discussed by the court above were all accurately cited and discussed by Defendant in his opening brief and otherwise constitute seminal authorities on contributory negligence in Virginia, including on the key element of proximate cause, these arguments are disingenuous and unpersuasive. Simply put, Quirk accurately marshaled overwhelming authority in support of his argument that Hart's contributory negligence—both *per se* and ordinary—was a proximate cause of the collision. Moreover, for the reasons discussed *supra*, summary judgment is appropriate because a reasonable jury viewing these undisputed facts could not reach any other conclusion.

Third, Hart argues that the court should deny summary judgment because Quirk failed to address the doctrine of last clear chance. (*Id.* at 5–6.) This argument amounts to little more than handwaving.

"The last clear chance doctrine, whether considered as a limitation upon or an exception to the strict common law rule of contributory negligence, allows a negligent plaintiff

to recover only if his negligence was in fact not a proximate cause, but only a remote cause or condition[] of the accident, and the negligence of the defendant was the sole proximate cause." *Greear v. Noland Co.*, 89 S.E.2d 49, 53 (Va. 1955). The doctrine applies in two situations: "(1) where the injured party has negligently placed himself in a position of peril from which he is physically unable to remove himself (the helpless plaintiff); and (2) where the injured party has negligently placed himself in a position of peril from which he is physically able to remove himself, but he is unconscious of his peril (the inattentive plaintiff)." *Williams v. Harrison*, 497 S.E.2d 467, 470 (Va. 1998). In the first situation, where the plaintiff is "physically incapacitated," "the defendant is liable if he saw or should have seen the helpless plaintiff." *Id.* "In the second situation, the defendant is liable only if he actually saw the inattentive plaintiff." *Id.* But either way, a contributorily negligent plaintiff must still point to some evidence "that the defendant realized or ought to have realized the peril of the helpless or inattentive plaintiff in time to avert the accident by use of reasonable care." *Id.* Failing that, his own negligence bars his recovery.

Although Hart conveniently elects not to analyze the record evidence against this standard, the court can safely assume that, *if anything*, he was an inattentive plaintiff.[8] But the record is devoid of any evidence from which a reasonable factfinder could find or infer that Quirk saw Hart in time to avoid the accident through the exercise of reasonable care. Quirk testified in painstaking detail that he never saw Hart until he had emerged from the narrow tunnel. Hart didn't refute this account in his own deposition, and he fails to point to any witnesses, exhibits, or other evidence that suggests, or that would support a reasonable

---

[8] That is, he clearly wasn't physically incapacitated prior to the accident.

inference, that Quirk saw him before he says he did. *See Anderson*, 477 U.S. at 249 (reiterating that the party opposing summary judgment must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party."). Put simply, there are no genuine disputes of material fact as to what Quirk saw and did prior to the collision. Accordingly, Hart's last-ditch invocation of the last clear chance doctrine to overcome his own negligence fails as a matter of law.

## IV. CONCLUSION

For the reasons discussed above, the court will grant Quirk's motion for summary judgment.

The clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 17th day of February, 2026.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE